**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ANGLERS CONSERVATION NETWORK,<br>9 Williamsburg Drive<br>Tinton Falls, NJ 07753 | )<br>)<br>)<br>) |
| CAPTAIN PAUL EIDMAN,<br>9 Williamsburg Drive<br>Tinton Falls, NJ 07753 | )<br>)<br>)<br>) |
| GATEWAY STRIPER CLUB, INC.,<br>56-30 49th Street<br>Maspeth, NY 11378 | )<br>)<br>)<br>) |
| PHILIP LOFGREN<br>10 Lochmere Avenue<br>North Weymouth, MA 02191 | )<br>)<br>)<br>) |
| *Plaintiffs,* | )<br>) |
| v. | )  CA No.<br>) |
| PENNY PRITZKER, in her official capacity as Secretary of the<br>Department of Commerce<br>1401 Constitution Avenue, NW<br>Washington, DC 20230 | )<br>)<br>)<br>) |
| NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION,<br>1401 Constitution Avenue, NW, Room 5128<br>Washington, DC 20230 | )<br>)<br>) |
| NATIONAL MARINE FISHERIES SERVICE,<br>1315 East-West Highway<br>Silver Spring, MD 20910 | )<br>)<br>) |
| CHRISTOPHER M. MOORE, in his official capacity as Executive<br>Director of the Mid-Atlantic Fishery Management Council<br>800 North State Street, Suite 201<br>Dover, DE 19901 | )<br>)<br>)<br>) |
| MID-ATLANTIC FISHERY MANAGEMENT COUNCIL<br>800 North State Street, Suite 201<br>Dover, DE 19901 | )<br>)<br>)<br>)<br>)<br>) |
| *Defendants.* | |

## COMPLAINT FOR DECLARATORY
## AND INJUNCTIVE RELIEF

1.      Plaintiffs, Anglers Conservation Network, Captain Paul Eidman, Gateway Striper

Club, and Philip Lofgren (together hereinafter "ACN"), hereby challenge the October 5, 2016

decision by the Mid-Atlantic Fishery Management Council,  Dr. Christopher M. Moore in his

official capacity as the Council's Executive Director(together hereinafter "Mid-Atlantic

Council"), Commerce Secretary Penny Pritzker, the National Oceanic and Atmospheric

Administration, and the National Marine Fisheries Service (together hereinafter "NMFS"), not to

add four species of river herring and shad as "stocks in the fishery" to the Mackerel, Squid, and

Butterfish Fishery Management Plan ("MSB FMP").

2.      This final agency action by the Mid-Atlantic Council and NMFS is inconsistent

with the Court's remedial orders in *Anglers Conservation Network v. Pritzker*, 139 F.Supp.3d

102 (D.D.C. 2015), Civ. No. 1:14- 0509 ("Anglers")[1] and violates the Magnuson-Stevens

Fishery Conservation and Management Act ("Magnuson-Stevens Act"), the National

Environmental Policy Act ("NEPA"), and the Administrative Procedure Act ("APA").

3.      The Court's October 5, 2016 Opinion in *Anglers* (ECF No. 47)[2] held that NMFS

violated NEPA and the APA by failing to take a "hard look" at the environmental impacts of its

definition of the fishery by analyzing a reasonable range of alternatives, including at least one

that immediately added river herring and shad to the MSB FMP, by failing to analyze the

environmental impacts of not adding river herring and shad to the fishery, and by failing to

---

[1]   Plaintiffs Complaint in *Anglers* (ECF No. 1) challenged a Final Rule, promulgated on
February 24, 2014, by Defendants Commerce Secretary Penny Pritzker, the National Oceanic
and Atmospheric Administration, and the National Marine Fisheries Service entitled Fisheries of
the Northeastern United States; Atlantic Mackerel, Squid, and Butterfish Fisheries; Amendment
14. 79 Fed. Reg. 10029 (Feb. 24, 2014)("Amendment 14" or "Final Rule").
[2] All references to an ECF No. refer to *Anglers Conservation Network v. Pritzker*, 139 F. Supp.
3d 102 (D.D.C. 2015).

consider the direct, indirect, and cumulative impacts of its decision in the accompanying EIS.

*See Anglers*, 139 F. Supp. 3d at 118-120 (remanding Amendment 14 and its accompanying EIS).

4.      The Court's Orders in *Anglers* required certain procedural steps be taken to guide

NMFS through completion of the more substantive remedial actions required by the Court,

including ensuring the Mid-Atlantic Council "reexamin[ed]" a 2013 White Paper by April 21,

2016 (ECF No. 53 at ¶4), "prepar[ed] and updat[ed]" a new White Paper and Draft Decision

Document by August 1, 2016 (ECF No. 53 at ¶¶5, 6), and "[took] a final vote" in October 2016

(ECF No. 53 at ¶7).  NMFS was also required to meet more substantive obligations that were the

heart of the Court's Orders necessary to bring Amendment 14 and its accompanying EIS into

compliance with the law, including ensuring full consideration by the Mid-Atlantic Council of:

1) a reasonable range of alternatives including an alternative that immediately adds river herring

and shad as stocks to the MSB fishery and manages them by use of proxies (ECF No. 53 at ¶¶5,

6); 2) the environmental impacts of the prior decision not to add river herring and shad to

Amendment 14 (ECF No. 53 at ¶8); 3) the environmental impacts of not including river herring

and shad in the fishery now (ECF No. 53 at ¶9); 4) the direct, indirect, and cumulative impacts of

those decisions, (*id.*); and 5) compliance with the Magnuson-Stevens Act and other applicable

law (ECF No. 58 at ¶1).

5.      The Mid-Atlantic Council's October 5, 2016 decision not to add river herring and

shad, species that that the Council recognizes as, and undeniable are, in need of conservation and

management as stocks in the MSB FMP violates the Magnuson-Stevens Act requirement to

prepare a fishery management plan or a plan amendment for each stock of fish under its authority

that requires conservation and management. 16 U.S.C. § 1852(h).  This failure to add river

herring and shad to the MSB FMP violates the Magnuson-Stevens Act's 2011 deadline to

implement management plans containing annual catch limits and accountability measures for all fisheries in need of conservation and management. Pub. L. No. 109–479, § 104(b), 120 Stat. 3575, 3584 (2007), codified at 16 U.S.C. § 1853 note; *see also Flaherty v. Bryson*, 850 F.Supp.2d 38, 51–52 (D.D.C. 2012).

6.      NMFS's failure to add river herring and shad to the MSB FMP and ensure upon remand that the Council carried out its decision making consistent with the Opinion (ECF No. 47) and the requirements of the Court's remedial orders (ECF Nos. 53 and 58) ("Orders"), Magnuson-Stevens Act, and other applicable law is unlawful.

7.      Specifically, NMFS failed to ensure that the Council prepared the necessary environmental analysis for the October 5, 2016 decision that: a) took a "hard look" at the environmental impacts of its definition of the fishery based on the best available science and the Magnuson-Stevens Act's statutory requirements relevant to defining the composition of a fishery, by analyzing a reasonable range of alternatives; and b) examined the direct, indirect, and cumulative impacts of its decision.   In violation of NEPA, NMFS also failed to ensure that the remanded Amendment 14 Final Environmental Impact Statement ("FEIS") took a hard look at the environmental impacts of the decision not to include these four species of river herring and shad in the fishery.

8.      As a result, NMFS has not implemented the required conservation and management measures necessary in Amendment 14 to rebuild and restore severely depleted populations of river herring and shad.

9.      Each of these actions and failures to act violates the statutory requirements of the Magnuson-Stevens Act and NEPA and is arbitrary, capricious, and an abuse of discretion, in violation of the APA.   These actions and failures to act by the Defendants have harmed the

Plaintiffs' interest in healthy and sustainable river herring and shad populations, and their interest in maintaining a healthy ocean ecosystem.  This harm will continue in the absence of action by this Court.

### APPLICABLE STATUTES, JURISDICTION, AND VENUE

10.     This action arises under the Magnuson-Stevens Fishery Conservation and Management Act ("Magnuson-Stevens Act"), 16 U.S.C. §§ 1801-1884; the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4370; and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706.

11.     This Court has jurisdiction over this action pursuant to the Magnuson-Stevens Act, which provides that "[t]he district courts of the United States shall have exclusive jurisdiction over any case or controversy arising under" the Magnuson-Stevens Act. 16 U.S.C. § 1861(d).  The Magnuson-Stevens Act also provides that actions taken by the Secretary of Commerce under regulations implementing a fishery management plan ("FMP") shall be subject to judicial review "if a petition for such review is filed within 30 days after the date on which the regulations are promulgated or the action is published in the Federal Register, as applicable." 16 U.S.C. § 1855(f).  Plaintiffs are filing this Complaint within thirty (30) days of final agency action on October 5, 2016.  This Court, further, has jurisdiction over this action pursuant to the APA, which provides that final agency action for which there is no other adequate remedy in a court is subject to judicial review. 5 U.S.C. §§ 701-706.

12.     This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), which grants the district courts "original jurisdiction of all civil actions arising under the . . . laws . . . of the United States," and 28 U.S.C. § 1361, which grants the district courts "original jurisdiction of any action in the nature of mandamus to compel an

officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff."

13.     This Court has the authority to grant declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, and may grant relief pursuant to the Magnuson-Stevens Act, 16 U.S.C. §§ 1861(d) and 1855(f), as well as the APA, 5 U.S.C. §706.

14.     Venue is properly vested in this judicial district under 28 U.S.C. § 1391(b) & (e), where the Defendants are officers or employees of the United States and reside in this district, and a substantial part of the events and omissions which gave rise to this action occurred in this district.

## DESCRIPTION OF THE PARTIES

15.     Plaintiff Anglers Conservation Network ("ACN") is a nonprofit corporation registered in the State of New Jersey composed of like-thinking, conservation-minded anglers (recreational fishermen) that "put the fish first."  ACN is suing on behalf of its members and itself.  ACN is based in Tinton Falls, New Jersey, and has a dedicated interest in protecting the East Coast's ocean and river ecosystems.  ACN's members believe that their resources could be lost if fishermen are not good stewards of the waters they fish.  ACN's mission includes fostering stewardship of the waters fished by its members, promoting conservation ethics, and meeting the responsibilities of its members to future generations by conserving fish and the ecosystems on which they rely.  Among other actions to further these goals, ACN seeks to increase personal involvement in regulatory activities affecting ocean fishing, facilitate the grassroots efforts of individuals and groups working at local and regional levels, help fishermen network with groups of other fishermen to participate in grass roots programs seeking to help conserve fishing resources, facilitate its members' participation in regulatory matters through

letter writing, petitions, and attending hearings and meetings, and encourage its members to take kids fishing.  Many of ACN's members fish, boat, study, and otherwise use and enjoy the Atlantic Ocean and tributary river waters.  The protection and restoration of river herring and shad, and the many predator species these fish support, is vital to the continued use and enjoyment of these waters by ACN members.  Members of ACN include fishermen, outdoor writers, scientists, educators, photographers and others who are directly affected by NMFS's failure to address the at-sea catch of river herring and shad in the Mackerel Squid Butterfish ("MSB") fishery, and the failure to include river herring and shad in the MSB FMP.  These failures by NMFS adversely affect ACN and its members because they deprive ACN and its members of conservation and management measures – including science-based catch limits and habitat and incidental catch protection – for river herring and shad sufficient to help ensure healthy and abundant populations of the fish that depend upon river herring and shad as prey. River herring and shad are also critical prey for other species that ACN members recognize and value as part of a healthy ocean ecosystem like striped bass, mammals, sea birds, and other animals.  Unless the relief sought in this complaint is granted, ACN's interests in healthy and sustainable populations of river herring and shad will continue to be adversely affected and irreparably harmed by the Mid-Atlantic Council and NMFS's unlawful failure to perform their duties required by the Magnuson-Stevens Act, NEPA, and the APA.

16.     Plaintiff Captain Paul Eidman owns and operates Reel Therapy, a fishing business based out of Tinton Falls, New Jersey, and he is also the founder and a current member of ACN. Captain Eidman is a fishing guide, and as part of his business he guides kayak-based eco-tours and other boat trips for people to see dolphins, osprey, bald eagles, wading birds like great blue herons, great and snowy egrets, and turtles, and to enjoy a healthy ocean environment.  Captain

Eidman has also worked with Rutgers University on "geo-tagging" river herring and shad to learn more about their life cycles, and has worked with NOAA Fisheries on the Raritan River Fish Passage Initiative, intended to improve and restore access to habitat on that river for river herring and shad.  Captain Eidman has spent over 17 years operating his fishing business and has been fishing in the waters off the New Jersey shore since age 14.  He currently resides year-round in Tinton Falls in order to actively pursue recreational fishing and his fishing business. Reel Therapy can be hired by persons wishing to fish recreationally for striped bass, bluefish, weak fish, summer flounder, and many other fish species.  Striped bass, in particular, are known to thrive when they consume river herring and shad as prey.  Captain Eidman takes his clients to many locations, including federal waters near northern New Jersey, to fish for many fish species other than striped bass that depend upon river herring and shad as prey, and to observe marine mammals and sea birds.  Captain Eidman is concerned that inadequate management of the fisheries that catch Atlantic mackerel, Atlantic herring, squid and butterfish is resulting in the species caught with them, like river herring and shad, to be caught at non-sustainable levels.  In the mid 1970's Mr. Eidman recalls a number of waters that were literally teeming with river herring in the spring.  He has been surveying these same waters for the past seven (7) years with his group (River Herring Rescue) and they have found that there are few or no river herring present. It is Mr. Eidman's view that there is no other explanation, such as decreased water quality or habitat loss, that could explain the decline in this river herring abundance other than the increased fishing in recent years by midwater trawl vessels.  Captain Eidman also is concerned that intensely concentrated fishing for mackerel or Atlantic herring by large midwater pair or single trawl vessels can quickly and completely deplete an area of forage fish like river herring and shad, thereby "driving off" all species of fish seeking to feed on them, including the

fish he seeks to catch recreationally or as part of his business.  Unless the relief sought in this complaint is granted, Captain Eidman's interests in healthy and sustainable populations of Atlantic herring, river herring, and shad will continue to be adversely affected and irreparably harmed by the Mid-Atlantic Council and NMFS's unlawful failure to perform their duties as required by the Magnuson-Stevens Act, NEPA, and the APA.

17.     Plaintiff Gateway Striper Club, Inc. ("GSC") is a fishing-based organization that was formed by local New York fisherman for the purpose of discussing, practicing, and promoting the sport of surf fishing.  GSC is suing on behalf of its members, supporters, and itself.  The club was organized in 1977, and maintains a general membership count of between 25 and 30 members. The current club mailing address is in Maspeth, Queens, New York, but meetings have typically been held in the Gateway National Recreation Area of Breezy Point, New York.  Its members are surfcasters who fish primarily for striped bass, bluefish, and weakfish, and do most of their fishing in and around the waters of New York and New Jersey. Gateway Striper Club's club motto has long been "Conservation First," and the Club has always had a longstanding interest in protecting the Mid-Atlantic Region's ocean and river ecosystems. GSC's mission includes teaching the art and sport of surfcasting and promoting the conservation of the ocean resources upon which their sport relies, which includes river herring and shad, which are vital prey species for the fish they catch.  Members of GSC have always taken active roles in local beach clean-ups, grass planting, and other environment-related activities in an effort to preserve the habitat and resource on which they depend.  Among other actions to further these goals, GSC seeks to become more politically active and to help support more conservation-related issues that affect the striped bass, bluefish, and weakfish fisheries that they share in. GSC's members fish and otherwise use and enjoy the Mid-Atlantic's ocean and river waters. The

protection and restoration of river herring and shad, and the many predator species that these fish support, including striped bass, bluefish, and weakfish, is vital to the continued use and enjoyment of these waters by GSC members.

18.     Members of GSC are fishermen, and they are also scuba divers, teachers, businessmen, photographers, and others who have an interest in seeing that our ocean species are protected as per the requirements of the Magnuson-Stevens Act.  The members of GSC have been adversely affected by NMFS's failure to address the at-sea catch of river herring and shad in the MSB fishery by not including river herring and shad in the MSB FMP.  Inclusion in the MSB FMP would result in conservation and management measures for river herring and shad, including science-based catch limits and habitat and bycatch protection, sufficient to help ensure healthy and abundant populations of not just river herring and shad, but also the fish that depend upon river herring and shad as prey.  It is the fish that depend upon the river herring and shad as prey that GSC's members catch; i.e., striped bass, bluefish, and weak fish.  At certain times of the season, river herring and shad can be a significant and critical part of the diets of these striped bass, bluefish, and weakfish.  Unless the relief sought in this complaint is granted, GSC's interests in healthy and sustainable populations of river herring and shad will continue to be adversely affected and irreparably harmed by the Mid-Atlantic Council and NMFS's unlawful failure to perform their duties required by the Magnuson-Stevens Act, NEPA, and the APA.

19.     Plaintiff Philip Lofgren is the assistant herring warden for the Town of Weymouth, Massachusetts, and has been a herring warden for 20 years.  As a herring warden, his responsibilities include ensuring functional fish passage for adult and juvenile river herring in the Weymouth Herring Run.  These duties last from early April, when river herring adults move upstream, through mid-December as juveniles move downstream on this run.  On his own time,

Mr. Lofgren also monitors and ensures safe passage on other local river herring runs in Cohasset, Scituate, Kingston, and Hanover, Massachusetts.  Mr. Lofgren publishes his fish counts on his "Weymouth Herring Run" Facebook Page.  While the Weymouth Herring Run is in the New England region, and the MSB fishery is managed by the Mid-Atlantic Council, the MSB fishery overlaps into New England waters during certain months of the year when river herring are at sea and current scientific information does not indicate where in the ocean river herring from the Weymouth Herring Run travel.  Mr. Lofgren strongly believes that the at-sea catch of river herring and shad is a primary factor affecting the weakness or strength in the number of fish returning to the Weymouth Herring Run and other East Coast rivers because the size of the runs he monitors vary greatly from year to year.  In Mr. Lofgren's view as herring warden, no other factors in his local runs, such as decreased water quality or habitat loss, could explain the fluctuation in the returning number of fish, other than fishing by mackerel and herring midwater trawl vessels.  Mr. Lofgren's work as herring warden demonstrates his use and enjoyment of the Weymouth Herring Run and the ocean waters offshore where river herring and shad spend the majority of their life cycles.  The protection and restoration of river herring and shad, and the many predator species these fish support, is vital to the continued use and enjoyment of these waters by Mr. Lofgren.  Mr. Lofgren is directly affected by NMFS's failure to address the at-sea catch of river herring and shad in the Atlantic mackerel and herring fisheries, and the failure to set science-based catch limits and measures to reduce bycatch and enhance habitat for river herring and shad, sufficient to help ensure healthy and abundant populations of these fish, along with the fish, mammals, sea birds, and other animals that depend upon river herring and shad as prey.  Unless the relief sought in this complaint is granted, Mr. Lofgren's interests in healthy and sustainable populations of river herring and shad will continue to be adversely affected and

irreparably harmed by the Mid-Atlantic Council and NMFS's unlawful failure to perform their duties required by the Magnuson-Stevens Act, NEPA, and the APA.

20.     Defendant Penny Pritzker is Secretary of the United States Department of Commerce ("Secretary").  She is sued in her official capacity as the chief officer of the Department charged with ensuring the legal requirements of the Magnuson-Stevens Act are met and the proper administration and implementation of NEPA and the Act, including provisions that require management of fish stocks in need of conservation and management and the implementation of annual catch limits and accountability measures that prevent overfishing and rebuild overfished species.

21.     Defendant National Oceanic and Atmospheric Administration ("NOAA") is an agency of the United States Department of Commerce with supervisory responsibility for the National Marine Fisheries Service.  The Secretary of the Department of Commerce has delegated responsibility to ensure compliance with the Magnuson-Stevens Act to NOAA, which in turn has sub-delegated that responsibility to the National Marine Fisheries Service.

22.     Defendant National Marine Fisheries Service ("NMFS" or "Fisheries Service") is an agency of the United States Department of Commerce that has been delegated the responsibility to review Fishery Management Plans ("FMPs") and amendments to those plans, and to issue implementing regulations.  NMFS is the United States government agency with primary responsibility to ensure that the requirements of the Magnuson-Stevens Act are followed and enforced, including the requirements to end overfishing, to rebuild overfished populations of fish, and to minimize bycatch.

23.     Defendant Mid-Atlantic Fishery Management Council is an authority of the government of the United States.  The Mid-Atlantic Council is an administrative unit of the

United States Department of Commerce and has substantial independent authority in the exercise of specific functions.  The Mid-Atlantic Council takes final agency action on those decisions where a fishery management plan or amendment is not transmitted to the Secretary of Commerce for approval, disapproval, or partial approval.

24.      Defendant Dr. Christopher M. Moore is the Executive Director of the Mid-Atlantic Fishery Management Council.  He is sued in his official capacity as the Director of the Mid-Atlantic Council, which is charged under the Magnuson-Stevens Act with meeting core requirements of the Magnuson-Stevens Act including the development of fishery management plans for fish stocks that require conservation and management.

## STATUTORY AND REGULATORY BACKGROUND

## MAGNUSON-STEVENS ACT

25.      The Magnuson-Stevens Act is designed to conserve and manage fish populations in the United States territorial waters and in the exclusive economic zone, which extends from the boundaries of state waters (3 miles from shore) to 200 miles offshore or to an international boundary with neighboring countries. 16 U.S.C. § 1801(b)(1).  The Magnuson-Stevens Act creates eight regional fishery management councils and mandates that each council "shall" prepare an FMP "for each fishery under its authority that requires conservation and management." 16 U.S.C. § 1852(h)(1).

26.      All FMPs and regulations implementing FMPs are subject to final review and approval by NMFS to ensure that they comply with the requirements of the Magnuson-Stevens Act, as well as with other applicable laws and requirements. 16 U.S.C. § 1854(a), (b).

27.      In enacting the Magnuson-Stevens Act, Congress found that:

Certain stocks of fish have declined to the point where their survival is threatened, and other stocks of fish have been so substantially reduced in number that they could become

similarly threatened as a consequence of (A) increased fishing pressure, (B) the inadequacy of fishery resource conservation and management practices and controls....Fishery resources are finite but renewable. If placed under sound management before overfishing has caused irreversible effects, the fisheries can be conserved and maintained so as to provide optimum yields on a continuing basis.

16 U.S.C. § 1801(a)(2), (5).

28.     The Act explicitly declares that it is the purpose of Congress in this Act "(1) to take immediate action to conserve and manage the fishery resources found off the coasts of the United States…" 16 U.S.C. § 1801(b)(1).

29.     The Magnuson-Stevens Act requires that each FMP must include a description of the fishery, including a description of the species of fish involved in the fishery. 16 U.S.C. § 1853(a)(2).

30.     The Act defines a "fishery" as: "…(A) one or more stocks of fish which can be treated as a unit for purposes of conservation and management and which are identified on the basis of geographical, scientific, technical, recreational, and economic characteristics…" 16 U.S.C. § 1802(13).

31.     A "stock of fish" is defined to include a species, subspecies, geographical grouping, or other category of fish capable of management as a unit. 16 U.S.C. § 1802(42).

32.     The Magnuson-Stevens Act requires each Council, in accordance with the Act, to proceed as follows: "(1) for each fishery under its authority that requires conservation and management, prepare and submit to the Secretary (A) a fishery management plan, and (B) amendments to each such plan that are necessary from time to time (and promptly whenever changes in conservation and management measures in another fishery substantially affect the fishery for which such plan was developed)." 16 U.S.C. § 1852(h)(1).

33.     The Magnuson-Stevens Act defines "conservation and management" as follows:

The term 'conservation and management' refers to all of the rules, regulations, conditions, methods, and other measures

(A) which are required to rebuild, restore, or maintain, and which are useful in rebuilding, restoring, or maintaining, any fishery resource and the marine environment; and
(B) which are designed to assure that —

 (i) a supply of food and other products may be taken, and that recreational benefits may be obtained, on a continuing basis;
 (ii) irreversible or long-term adverse effects on fishery resources and the marine environment are avoided; and
 (iii) there will be a multiplicity of options available with respect to future uses of these resources.

16 U.S.C. § 1802(5).

34. If a Council fails to develop an FMP or amendment for a fishery that requires conservation and management within a reasonable period of time, the Secretary is authorized to prepare it herself in accordance with the Act, the national standards, and any other applicable law. 16 U.S.C. § 1854(c).

35. According to the Magnuson-Stevens Act, FMPs are to "contain the conservation and management measures…necessary…to prevent overfishing and rebuild overfished stocks, and to protect, restore, and promote the long-term health and stability of the fishery." 16 U.S.C. § 1853(a)(1)(A).

36. The Magnuson-Stevens requires implementation of fishery management plans containing annual catch limits and accountability measures that prevent overfishing for all stocks in need of conservation and management no later than 2011. Pub. L. No 109-479, § 104(b), 120 Stat. 3575, 3584 (2007). 16 U.S.C. § 1853 note.

37. The Magnuson-Stevens Act requires that the conservation and management measures prepared in an FMP, and any regulations promulgated to implement such measures,

must be consistent with the "national standards" for fishery conservation and management, and certain other requirements. 16 U.S.C. § 1851(a).

38.     The Magnuson-Stevens Act requires the Secretary (acting through NMFS) to establish advisory guidelines for these national standards which specifically do not have the force and effect of law. 16 U.S.C. § 1851(b).

39.     On January 20, 2015, NMFS published a proposed rule that included revisions to the National Standard guidelines. *See* 80 Fed. Reg. 2786 (Jan. 20, 2015).

40.     The proposed revisions to the National Standard 1 guidelines included a "list of factors" to guide Councils when deciding whether stocks (in addition to those the Secretary has officially declared overfished, or subject to overfishing) require conservation and management:

(c) Stocks that require conservation and management.

(1) Magnuson-Stevens Act section 302(h)(1) requires a Council to prepare an FMP for each fishery under its authority that requires (or in other words, is in need of) conservation and management. Not every fishery requires Federal management. Any stocks that are predominately caught in Federal waters and are overfished or subject to overfishing, or likely to become overfished or subject to overfishing, are considered to require conservation and management. In addition, the following non-exhaustive list of factors should be used by a Council when deciding whether stocks require conservation and management:

(i)      The stock is an important component of the marine environment.
(ii)     The stock is caught by the fishery.
(iii)    Whether an FMP can improve or maintain the condition of the stocks.
(iv)     The stock is a target of a fishery.
(v)      The stock is important to commercial, recreational, or subsistence users.
(vi)     The fishery is important to the Nation and to the regional economy.
(vii)    The need to resolve competing interests and conflicts among user groups and whether an FMP can further that resolution.
(viii)   The economic condition of a fishery and whether an FMP can produce more efficient utilization.
(ix)     The needs of a developing fishery, and whether an FMP can foster orderly growth.
(x)      The extent to which the fishery could be or is already adequately managed by states, by state/Federal programs, by Federal regulations pursuant to

other FMPs or international commissions, or by industry self-regulation,
consistent with the policies and standards of the Magnuson-Stevens Act.

50 C.F.R. 600.305(c)(1)(i)-(x).

41.     On October 18, 2016, the final guidelines were published in the federal register.

*Final Rule*, 81 Fed. Reg. 71858 (Oct. 18, 2016) ("The purpose of this action is to facilitate

compliance with requirements of the MSA to end and prevent overfishing, rebuild overfished

stocks, and achieve optimum yield (OY).").

42.     The final revised National Standard 1 guidelines recommend the identification of

stocks that require conservation and management so that annual catch limits ("ACLs"), other

reference points, and accountability measures can be developed. *See* 50 C.F.R. §§ 600.310(d)(1)

("Councils should identify in their FMPs the stocks that require conservation and

management."), (b)(2)(iv) (SDC, MSY, OY, ABC, and ACL "are collectively referred to as

'reference points'"), (e)(2)(i) ("Status determination criteria (SDC) mean the measurable and

objective factors, MFMT, OFL, and MSST, or their proxies, that are used to determine if

overfishing has occurred, or if the stock or stock complex is overfished.").

43.     The final revised National Standard 1 guidelines (2016)("Final Revised National

Standard 1 Guidelines") retained a "list of factors" to guide Councils when deciding whether

stocks (in addition to those the Secretary has officially declared overfished, or subject to

overfishing) require conservation and management:

(c) *Stocks that require conservation and management.* (1) Magnuson- Stevens Act
section 302(h)(1) requires a Council to prepare an FMP for each fishery under its
authority that requires (or in other words, is in need of) conservation and management. 16
U.S.C. 1852(h)(1). Not every fishery requires Federal management. Any stocks that are
predominately caught in Federal waters and are overfished or subject to overfishing, or
likely to become overfished or subject to overfishing, are considered to require
conservation and management. Beyond such stocks, Councils may determine that
additional stocks require ''conservation and management.'' (See Magnuson-Stevens Act
definition at 16 U.S.C. 1802(5)). Based on this definition of conservation and

17

management, and other relevant provisions of the Magnuson-Stevens Act, a Council
should consider the following nonexhaustive list of factors when deciding whether
additional stocks require conservation and management:

    (i)     The stock is an important component of the marine environment

    (ii)    The stock is caught by the fishery.

    (iii)   Whether an FMP can improve or maintain the condition of the stock.

    (iv)   The stock is a target of a fishery.

    (v)    The stock is important to commercial, recreational, or subsistence users.

    (vi)   The fishery is important to the Nation or to the regional economy.

    (vii)  The need to resolve competing interests and conflicts among user groups
and whether an FMP can further that resolution.

    (viii) The economic condition of a fishery and whether an FMP can produce
more efficient utilization.

    (ix)   The needs of a developing fishery, and whether an FMP can foster orderly
growth.

    (x)    The extent to which the fishery is already adequately managed by states,
by state/Federal programs, or by Federal regulations pursuant to other
FMPs or international commissions, or by industry self-regulation,
consistent with the requirements of the Magnuson-Stevens Act and other
applicable law.

50 C.F.R. § 600.305(c)(1)(i)-(x).

44.     The Secretary has the responsibility to carry out any FMP or amendment

approved or prepared by her in accordance with the Magnuson-Stevens Act. 16 U.S.C. §

1855(d). The Secretary may promulgate such regulations, pursuant to APA rulemaking

procedures, as may be necessary to carry out this responsibility or to carry out any other

provisions of the Magnuson-Stevens Act. *Id.*

<u>**NATIONAL ENVIRONMENTAL POLICY ACT**</u>

45.     Congress enacted the National Environmental Policy Act ("NEPA") to "promote

efforts which will prevent or eliminate damage to the environment . . . ." 42 U.S.C. § 4321. To

achieve this goal, NEPA requires federal agencies to fully consider and disclose the

environmental consequences of an agency action before proceeding with that action. *See id.* §

4332(2)(C); 40 C.F.R. §§ 1501.2, 1502.5. Agencies' evaluations of environmental consequences

must be based on scientific information that is both "[a]ccurate" and of "high quality." 40 C.F.R.

§ 1500.1(b). In addition, federal agencies must notify the public of proposed projects and allow

the public the chance to comment on the environmental impacts of their actions. *See id.* § 1506.6.

46.     The cornerstone of NEPA is the EIS. An EIS is required for all "major Federal

actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C);

40 C.F.R. § 1501.4.

47.     The EIS must provide a "full and fair discussion of significant environmental

impacts and . . . inform decisionmakers and the public of the reasonable alternatives which

would avoid or minimize adverse impacts or enhance the quality of the human environment." 40

C.F.R. § 1502.1.

48.     NEPA requires that an EIS rigorously explore and objectively evaluate all

reasonable alternatives and their associated environmental impacts on the environment. 42

U.S.C. 4332(C)(iii); 40 C.F.R. § 1502.14.  The environmental impacts and the alternatives

should be presented "in comparative form, thus sharply defining the issues and providing a clear

basis for choice among options" by decision-makers and the public.  42 U.S.C. 4332(C); 40

C.F.R. § 1502.1; 40 C.F.R. § 1502.14.

49.     The EIS must include analysis of the environmental consequences of the proposed

action and its alternatives.  When evaluating the environmental consequences in the EIS, the

federal agency must include analysis of the direct, indirect, and cumulative impacts of the

proposed action, and their significance. 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1502.16; 40 C.F.R.

§ 1508.7-8.

50.     Agencies must consider "[c]onnected actions," "[c]umulative actions," and

"[s]imilar actions" together in one environmental impact statement. 40 C.F.R. § 1508.25(a)(1)-

(3). Actions are "[c]onnected actions" if they: a. "[a]utomatically trigger other actions which may require environmental impact statements[,]" b. "[c]annot or will not proceed unless other actions are taken previously or simultaneously[,]" or c. "[a]re interdependent parts of a larger action and depend on the larger action for their justification." *Id.* § 1508.25(a)(1)(i)-(iii).

51.      When evaluating the environmental consequences, the federal agency must also analyze the relationship between short-term uses of the environment and the maintenance and enhancement of long-term productivity, and any adverse environmental effects that cannot be avoided should the proposed action be implemented. See 42 U.S.C. §§ 4332(2)(C)(ii), (iv); 40 C.F.R. § 1502.16 .

52.      Agencies must prepare supplements to either draft or final EIS's when the agency makes substantial changes to the proposed action that are relevant to the environmental concerns or there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts. See 40 C.F.R. § 1502.9(c).

53.      The APA confers a right of judicial review on any person adversely affected by agency action. 5 U.S.C. § 702. The APA provides that the reviewing court "shall… hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), and shall "compel agency action unlawfully withheld or unreasonably delayed." *Id.* § 706(1).

54.      The decision by the Council not to add river herring and shad to the MSB FMP is "final agency action" subject to judicial review under the APA.

55.      The decision by NMFS not to add river herring and shad to the MSB FMP is "final agency action" subject to judicial review under the APA.

# FACTUAL BACKGROUND

## I.   River Herring and Shad in the Mid-Atlantic Region

56.     River herring and shad[3] are important forage fish in the ocean ecosystem.  As "anadromous" species that spawn in rivers but spend the majority of their life cycle at sea, they play a critical role in the biology of rivers, estuaries and ocean waters along the Atlantic seaboard as prey, or "forage," for many species of fish, birds, and marine mammals.  These species include striped bass, weakfish, bluefish, bluefin tuna, marlin, sharks, ospreys, loons, herons, bald eagles, egrets, kingfishers, harbor seals, porpoises, whales, and river otters.   River herring and shad are particularly critical to striped bass because in the spring when river herring and shads swim up the coast and enter into freshwater rivers, striped bass follow, feeding on them en route to their own spawning grounds.

57.     Once abundant throughout the region, river herring and shad populations have declined to historic lows in recent decades as a result of overfishing, habitat loss, and other factors.  The best available science indicates that river herring and shad populations have declined by an estimated 93 to 98 percent.[4]

58.     The most recent stock assessment for river herring found that 23 of 24 adequately assessed stocks are depleted, including 10 stocks that are listed as overfished in part due to ocean

---

[3] For the purposes of this Complaint, the term river herring includes two species of river herring: blueback herring (*Alosa aestivalis*) and alewife (*Alosa pseudoharengus*).  The term shad includes two species of shad: American shad (*Alosa sapidissima*) and hickory shad (*Alosa mediocris*).

[4] *See* Limburg KE, Waldman JR. 2009. Dramatic declines in North Atlantic diadromous fishes. BioScience. 59:955–965, Table 2 (showing populations of all anadromous fish have declined dramatically (98 percent for RH and 97 percent for shad) from the historical baseline and concluding that the
loss has corrupted ecological connections in the North Atlantic ecosystem); Hasselman, et.al. 2016. Genetic stock composition of marine bycatch reveals disproportional impacts on depleted river herring genetic stocks. Canadian Journal of Fisheries and Aquatics Science. 73: 1–13; see also NMFS Listing Determination for River Herring, 78 Fed. Reg. 48944, 48948 (Aug. 12, 2013)(noting landings have declined by 97 percent).

intercept fisheries.[5]  The most recent stock assessment for shad found that stocks were at all-time lows and did not appear to be recovering to sustainable levels.[6]

59.     Specifically in the Mid-Atlantic region, the best available science shows that "[r]ecent … declines may have been triggered by overharvest in marine fisheries," and that Mid-Atlantic populations are particularly in need of conservation.[7]

60.     Since the last decision, various population surveys spanning more recent time frames show similar declining trends at the individual river and stream level in the Mid-Atlantic. Specifically, river herring abundance in estuaries and rivers from Long Island Sound to North Carolina has not increased.  *See* Exhibit 3 (Decision Document) at pp. 27-34 (data in some cases through 2015).

61.     Recent peer reviewed scientific papers demonstrate that management in federal waters is needed to rebuild populations.  For example, a recently published paper (2014) demonstrates that the catch of river herring from New Jersey to Southern New England is particularly significant because it is mostly comprised of less migratory juveniles and will have greater impacts on nearby rivers and year-classes of fish.[8]

62.     Another recent (2016) paper demonstrates that raising the river herring and shad catch caps in Southern New England would have a disproportionate impact on Mid-Atlantic

---

[5] *See* ASMFC *River Herring Stock Assessment Overview* (May 2012); *see also* ASMFC, *Stock Assessment Report No. 12-02, River Herring Benchmark Stock Assessment, Volume II* (May 2012), at 412.

[6] *See* ASMFC American Shad Stock Assessment Peer Review Panel.  Stock Assessment Report No. 07-01 of the Atlantic States Marine Fisheries Commission, Terms of Reference & Advisory Report to the American Shad Stock Assessment Peer Review.

[7] Palkovacs, E.P., *et al*. 2013. Combining genetic and demographic information to prioritize conservation efforts for anadromous alewife and blueback herring. Evolutionary Applications ISSN 1752-4571.

[8] http://s3.amazonaws.com/nefmc.org/Bethoney-et-al-2014-MWT-river-herring-bycatch-characterization.pdf.

blueback herring populations[9] which are already at moderate-low risk of extinction according to NMFS.[10]   Addressing bycatch in this region, the author's state:

> "Bycatch overall, but especially in the Atlantic herring fishery, was disproportionately assigned to the most severely depleted genetic stocks (alewife southern New England stock—70% of assignments; blueback herring mid-Atlantic stock—78% of assignments). These genetic stocks overlap in the region surrounding Long Island Sound, suggesting that bycatch taken from this area in recent years may be negatively impacting recovery efforts in this region. *Our study suggests that mitigating bycatch on the southern New England fishing grounds may benefit recovery efforts for alewife and blueback herring genetic stocks that have experienced the greatest declines in spawning adult abundances."[11]*

63.     The primary marine fishery in the Mid-Atlantic that catches river herring and shad is the mackerel fishery, which has been dominated beginning in the 1990s by industrial single and paired midwater trawl vessels.  These vessels can catch millions of pounds of river herring and shad per year and could catch an entire river run of river herring or shad with one tow of their net.

64.     Since the Amendment 14 decision, it has also become evident that the longfin squid fishery in the Mid-Atlantic catches significant amounts of river herring and shad per year.  Recent data indicates that from 2013-2015, over 100,000 pounds of RH/S may have been caught annually between in the Atlantic squid fishery.[12]

## II.   Defendants' Actions Demonstrating River Herring and Shad Need Conservation and Management

65.     Several actions have been taken in the past 10 years in recognition that river

---

[9] Hasselman, et.al. 2016. Genetic stock composition of marine bycatch reveals disproportional impacts on depleted river herring genetic stocks. Canadian Journal of Fisheries and Aquatics Science. 73: 1–13.

[10] NMFS Listing Determination for River Herring, 78 Fed. Reg. 48944, 48992 (Aug. 12, 2013).

[11] *See* supra at fn. 20 Hasselman, et al. 2016 (emphasis added).

[12] *See* Discards Summary for the Longfin Squid Trawl Fishery, available at: http://static1.squarespace.com/static/511cdc7fe4b00307a2628ac6/t/57d1668fd482e9cbbd044de3/1473341072809/Discards+in+the+Longfin+Squid+Trawl+Fishery.pdf.

herring and shad require conservation and management.

66.     Citing concerns over the "drastic decline in river herring populations throughout much of their range," the Protected Species Division of NMFS designated river herring as a "*species of concern*" in 2006. 71 Fed. Reg. 61022 (Oct. 17, 2006).

67.     On June 9, 2010, NMFS announced its intent to prepare an EIS for "Amendment 14" to the MSB FMP. *See* 75 Fed. Reg. 32745 (June 9, 2010).  Amendment 14 was initiated to address conservation and management needs for river herring and shad. *See* Section 4.1 Problems/Needs For Action and Corresponding Purposes and Background, Amendment 14 DEIS at 111.

68.     In response to severe declines in populations the ASMFC[13] required moratoria on the harvest of river herring in most Mid-Atlantic states and prohibited commercial and recreational fisheries beginning January 1, 2012, which could only be lifted if a state or developed a sustainable management plan that was approved by the ASMFC.  The most recent stock assessment  report determined that additional management of river herring is required:

> Due to the poor condition of many river herring stocks, management actions to reduce total mortality are needed. These could include reductions in directed commercial or recreational fishery mortalities, reductions in total incidental catch (retained and discarded fish), habitat restoration, and improvements in upriver and downstream fish passage.[14]

69.     In 2013, NMFS considered a petition to list river herring as a "threatened" species under the Endangered Species Act in 2013. *See* 78 Fed. Reg. 48944 (Aug. 12, 2013).  A threatened species is one that is likely to become endangered (in danger of extinction) in the

---

[13] Although this action was not taken by Defendants, it is evidence that conservation and management of river herring and shad is needed.

[14] ASFMC, Stock Assessment Report No. 12-02, River Herring Benchmark Stock Assessment, Volume I, Section C, River Herring Stock Assessment Report for Peer Review, at 58 (May 2012).

foreseeable future. *Id.* at 48946/1-2.  Though it denied the petition, NMFS determined that: 1) mid-Atlantic bluebacks are at "moderate-low risk of extinction," *Id.*, 48992; 2) "current directed commercial and recreational alewife and blueback herring fisheries, as well as commercial fishery incidental catch may continue to pose a threat to these species," *id.* at 48961; and 3) incidental catch in small mesh fisheries remains a "substantial source of fishing mortality," *id.* at 48964.  Although finding the Mid-Atlantic blueback population particularly imperiled, NMFS determined that because in its view the entire species would not be in danger of extinction if Mid-Atlantic bluebacks were lost forever, the populations should not be listed as a threatened species at this time. *See id.* at 48944/1.  Acknowledging the need for conservation and management, NMFS initiated a conservation plan, recommended maintaining river herring as a "*species of concern,*" and stated that it would revisit data uncertainties and gaps in the available information in three to five years. *Id.* at 48994/1-2.

70.     Since the Amendment 14 decision, in further recognition that management in federal waters was required, the Council developed and NMFS implemented a "catch cap" for river herring and shad in the mackerel fishery. *See* 79 Fed. Reg. 1813 (Jan. 10, 2014).   NMFS also implemented catch caps for river herring and shad in the herring fishery. *See* 79 Fed. Reg. 71960 (Dec. 4, 2014).

71.     Since the Amendment 14 decision, to address the substantial and ongoing catch of river herring and shad that occurs at sea, NMFS initiated an Industry-Funded Monitoring Amendment "to help improve estimates of catch tracked against harvest limits and fishery catch caps."[15]

---

[15] *See* Industry-Funded Monitoring Omnibus Amendment Public Hearing Document (September 2016) at 5, available at:

72.     Millions of dollars have also been spent to improve water quality and restore habitat for river herring. From 1998 to 2006 alone, more than $100 million in federal, state, and private dollars were spent to restore habitat through projects that removed dams, build fish passage, and overall opened up thousands of acres of healthy spawning habitat to river herring and shad. *See* Exhibit 3 (Decision Document) at 63.

73.     Since the Amendment 14 decision (2014), NMFS and the ASMFC with input from the Mid-Atlantic Council developed a "Proactive Conservation Plan," which is described as a strategy to increase public awareness, stimulate cooperative research, and inform efforts to help restore river herring populations.

74.     Despite these efforts, coastwide population levels have failed to rebound and there are few signs of sustained recovery at the individual stream or river level, particularly in the Mid-Atlantic region, because of the substantial continuing catch of river herring and shad at sea.

III.     **Management of the Mackerel and Squid Fisheries**

75.     The mackerel and squid fisheries are managed through the MSB FMP.  This plan was first developed and implemented by the Council in 1983 and manages Atlantic mackerel, longfin squid, Illex squid, and butterfish catch limits and additional conservation and management measures.

76.     The mackerel fishery is a directed fishery prosecuted primarily by midwater trawl vessels and small mesh bottom trawl vessels that also target Atlantic herring (often at the same time).  The midwater trawl vessels frequently operate in pairs as "pair trawls" so they can drag extremely large small mesh nets behind two vessels to capture mackerel and herring, but they also catches other species including river herring and shad.

https://www.greateratlantic.fisheries.noaa.gov/regs/2016/September/ifmamendpublichearingdoc.pdf.

77.     River herring and shad are inextricably involved in the mackerel fishery. Although they are different species from Atlantic mackerel (and Atlantic herring), river herring and shad are similar in size and schooling behavior, and are landed and sold in the fishery primarily as bait.  River herring and shad are likely subject to overfishing, and are overfished, based on the best available scientific information, although NMFS has declined to make such designations official.

78.      The squid fishery is a directed fishery prosecuted primarily by similar trawlers that also uses small mesh.  Since the Amendment 14 decision, new data has surfaced about catch of river herring and shad in the longfin squid fishery.  Because of the emerging recognition of this bycatch problem, the Cornell Cooperative Extension's Fisheries Program started a voluntary bycatch avoidance program for the longfin squid fishery.

79.     Catch of river herring and shad in the MSB fisheries contributes significantly to their total known mortality.  Analysis used by Defendants in Amendment 14 to the MSB FMP demonstrates:

> …on average, about 960,000 pounds of river herrings and about 120,000 pounds of shads were caught in ocean intercept fisheries during [2006-2010]. Ocean-intercept fish often are juveniles, so, if you assume five fish per pound, these numbers translate into around 5 million river herrings and 600,000 shads being caught each year on average. The data suggest that the mackerel and longfin squid fisheries account for a portion of this total catch and that the mackerel fishery may have substantial encounters with river herrings in some years.

Amendment 14 FEIS at 104 of 526 (pdf), available at:
http://www.nero.noaa.gov/regs/2013/August/13smbamend14prfeis.pdf.

80.     Although it is generally accepted that the best way to monitor fisheries is to place federal monitors ("observers") on fishing vessels, historically the percentage of mackerel trips actually observed is very low (from 2006-2010 approximately 6.5 percent of mackerel catch by weight were observed).

81.     Since the Amendment 14 decision, observer coverage has not improved.  The 2015 coverage rates for relevant fisheries were 4.7 percent for mid-water trawl (MWT), 2.5 percent for purse seine, and 9.1 percent for small mesh bottom trawl (NMFS 2016).  Observer coverage in the mackerel fishery is determined by methods outlined in NMFS's Standardized Bycatch Reporting Methodology ("SBRM"); however, because river herring and shad are not federally-managed species, they are not included in this analysis.   The observer coverage in the mackerel fishery is inadequate to reliably monitor the catch of river herring and shad in this fishery and in any event the catch cap limit will not be set at a level likely to actually limit incidental catch of these species in a meaningful way. This is because the catch cap is based merely on an estimate of the recent catch of river herring and shad in this fishery, instead of factors related to the actual biology of these species

82.     While some additional river herring and shad catch data exist based on fish that are brought back to the dock and observed there, vessels in the mackerel fishery dump significant unknown amounts of fish at sea for a number of reasons (slippage), including because the catch contains bycatch of non-target species including protected species. *See* Amendment 14 DEIS at 314 (slippage on 26 percent of mackerel trips), 340 (slippage biases data), 145 ("Considerable uncertainty in RH/S catch remains, especially in pair-trawling that targets mackerel and in bottom-trawling primarily because of the rare-event nature of large incidental RH/S catches"). Moreover, there is no independent weighing or verification of estimated weights of the fish landed.  The current system for monitoring catch in this fishery is based largely on unverified vessel reports of catch provided by vessel captains and contains other known gaps in the monitoring system that allow for, among other things, unobserved fishing trips and the ability to dump unobserved catch, even when a fishery observer is on board the vessel.

83.     Since September 11, 2015, slippage has been prohibited in the mackerel and longfin squid fishery with certain exemptions, however, due to extremely low observer coverage this prohibition has little or no impact on catch of river herring and shad.

84.     Since the Amendment 14 decision, Mid-Atlantic Council staff analysis has acknowledged that catch caps do not actually limit catch in the mackerel fishery (due to the current near absence of a significant fishery) thus are not a suitable alternative to federal management of these species as stocks in the fishery and cannot be deemed sufficient to rebuild these depleted populations because they are not based on scientifically determined status determination criteria and will not provide science-based ACLs or accountability measures, protect essential fish habitat, or provide the other benefits afforded to stocks included in the fishery.[16]

### IV.     NMFS and Mid-Atlantic Council Actions During Remand of Amendment 14

85.     In 2014, Plaintiffs filed suit challenging NMFS's failure to add river herring and shad to the MSB FMP through Amendment 14 to the plan. *See* ECF No. 1.

86.     The Court's October, 5 2015 Opinion held that NMFS violated NEPA and the APA by failing to take a "hard look" at the environmental impacts of its definition of the fishery by analyzing a reasonable range of alternatives, including at least one that immediately added river herring and shad to the MSB FMP, by failing to analyze the environmental impacts of not adding river herring and shad to the fishery, and by failing to consider the direct, indirect, and

---

[16] *See* Exhibit 3 (Decision Document) at 74, 75 ("There have been no closures related to the RH/S cap so far. Low mackerel landings have contributed to the low RH/S estimates… The Monitoring Committee has not found any operational issues with the cap, other than noting that the recent low observer coverage and high RH/S catch variability means precision may be low, which means that the RH/S cap may be substantially under or overestimated in some years…the mackerel fishery has not been very active, and that could be the main driver of cap performance.").

cumulative impacts of its decision in the accompanying EIS. *See* ECF No. 47 at p. 37; *Anglers Cons. Network v. Pritzker,* 139 F. Supp. 3d 102, 118-120 (D.D.C. 2015).

87.     After remedy briefing, the Court remanded Amendment 14 to NMFS "to ensure that this time around," NMFS complied with NEPA and "took a 'hard look' at the environmental impacts of its definition of fishery, and whether River Herring and Shad should be included in the Fishery Management Plan." ECF No. 53 at 2.

88.     The Court explicitly stated that NMFS "<u>shall</u> ensure" that the Council take a number of specific actions.  When NMFS questioned this remedial language, the Court issued a second order that further clarified that NMFS is the backstop for ensuring the Magnuson-Stevens Act and other applicable law is followed:

> Defendants request that the Remedial Order require the Defendants to "recommend action," rather than "ensure action," by the Mid-Atlantic Fishery Management Council ("Council").  Their rationale is that NMFS does not have authority to "ensure" what action the Council takes. The Government misinterprets the language in the Remedial Order.  NMFS does not have authority to order any of the Councils to take a specific action; that much is clear.  However, once a Council reaches a final decision, it is then NMFS which has the ultimate statutory responsibility for ensuring that the requirements of the Magnuson-Stevens Act and any other applicable laws are met. <u>See Flaherty v. Bryson</u>, 850 F. Supp. 2d 38, 54-56 (D.D.C. 2012).

Mem. Op. ¶1ECF No. 58 at ¶1.

89.     In response to the Court's Orders, the Mid-Atlantic Council's River Herring and Shad Committee met in August to review the White Paper[17] and the August 1 Draft Decision Document.[18]  Members of the Committee, officials from NMFS, and members of the public

---

[17] White Paper attached hereto as Exhibit 1.
[18] Draft Decision Document attached hereto as Exhibit 2

noted inaccuracies, incomplete analysis, and other concerns, and asked Council staff to revise and expand the analysis in the decision document.[19]

90.     One week prior to the Council meeting, the Council posted the revised materials on the Council's website, *see* ECF No. 67 at 2 (NMFS's Notice of Council Action and of Compliance with Remedy Order), however, by that time there was no further time or opportunity for additional revisions.

91.     The White Paper and final Decision Document[20] describe the actions taken by NMFS, the Mid-Atlantic Council, and others to conserve and manage river herring and shad: (1) actions to limit catch though moratoriums on directed fishing in state waters under interstate fishery management plans; (2) actions by NMFS intended to limit catch and improve monitoring in federal waters (catch caps and "slippage" (dumping unobserved fish at sea) measures); (3) actions that could improve monitoring and decrease some of the uncertainty in catch estimates; and (4) creation of a Technical Expert Working Group's ("TEWG") to identify data gaps for additional research needs.

92.     The analysis contained in these documents: (1) did not analyze alternatives previously in Amendment 14 (Alternative set 9)[21] – which would have allowed the addition of

---

[19] *See* August 15 RH/S Committee Meeting Summary, available at:
https://static1.squarespace.com/static/511cdc7fe4b00307a2628ac6/t/57e96a75bebafb818ea9e767/1474914938743/Tab02_RHS.pdf, and attached as Exhibit 10; *see also* August 15 RH/S Committee Meeting Audio available at http://mafmc.adobeconnect.com/p51k3jv3hf6/ (for the Court's convenience a transcript of this audio has also been provided as Exhibit 7); Letter from Earthjustice to MAFMC regarding revisions to White Paper and Draft Decision Document, attached as Exhibit 4.

[20] Decision Document attached hereto as Exhibit 3.

[21] Alternative Set 9 would have individually added blueback herring (Alternative 9b), Alewife (Alternative 9c), American shad (Alternative 9d), and hickory shad (Alternative 9e) as a stock in the MSB FMP.  The DEIS was explicit that the foregone benefits of not adding these species as stocks in the fishery through Alternative Set 9 included: no additional federal support for management, no consideration of observer coverage needs, no direct controls on federal catch,

individual species rather than all four river herring and shad species to the plan–despite new

scientific evidence showing that the most-threatened species at issue, the Mid-Atlantic blueback

herring population  are caught in substantial amounts in several small mesh fisheries and their

ability to rebuild is hampered by this catch; [22] (2) the impacts analysis did not address the impact

(including the benefits of rebuilding) of limiting catch in <u>all</u> fisheries where they are caught, or

the impacts of the inability of these populations to rebuild under status quo management, despite

new evidence that river herring and shad are caught in significant numbers in the squid and other

small mesh fisheries; (3) did not provide any cumulative impacts analysis at all; and (4) did not

rely on the best available science.

> 93.    On October 4, 2016 the Mid-Atlantic Council's MSB Committee met, discussed

the revised draft decision document, and passed a recommendation for the full Council's

consideration, as follows:

> that the Council not act to add RH/S as stocks in the MSB FMP and that it shall
> be the policy of the MAFMC to aggressively protect river herring and shad stocks
> by proactively using the tools provided in the recently approved EAFM Guidance
> Document and continuing to use the catch caps to provide strong incentives to
> harvesters such that they will change the "when where and how" they fish so as to
> reduce river herring and shad bycatch.

*See* ECF No. 67-1 (October 6, 2016 email from Ms. Jan Saunders, Executive Assistant, Mid-

Atlantic Fishery Management Council).

---

no ability to address the catch or discarding in other fisheries, and no essential fish habitat
designation. AR 8619. The DEIS was also explicit that state management could not effectively
account for all catch. AR 8625 ("it currently seems likely that ACLs and AMs would be needed,
i.e. it would be difficult to argue that the state management would effectively account for all
catch. This is at least the viewpoint of the Amendment 14 FMAT Team and NOAA GC").

[22] *See* Exhibit 1 (White Paper) at 37 ("Bycatch overall, but especially in the Atlantic herring
fishery, was disproportionately assigned to the most severely depleted genetic stocks (alewife
southern New England stock—70% of assignments; blueback herring mid-Atlantic stock—78%
of assignments). The authors suggested that mitigating bycatch on the southern New England
fishing grounds may therefore benefit recovery efforts for alewife and blueback herring genetic
stocks that have experienced the greatest declines in spawning adult abundances.").

94.     Fishermen, conservation groups, and other members of the public submitted 19,000 written comments to the Mid-Atlantic Council, many of which contained detailed new information and scientific research findings, requesting federal management of river herring and shad.[23]  No one submitted comments in opposition.

95.     Many commenters, including one of the Nations' leading scientists who has studied and recently published relevant peer reviewed scientific journal articles describing the plight of river herring and the need for their conservation and management in federal waters, testified and directly contradicted some of the key staff findings.[24]

96.     Instead of looking at the statutory definition of conservation and management, the Mid-Atlantic Council followed the guidance contained in the White Paper and Decision Document that applied factors not included in the statutory definition of conservation and management, including factors found in the proposed National Standard 1 guidelines, and concluded that it is "unlikely that FMP management would lead to any substantial improvements in management of RH/S beyond what is already occurring."[25]

97.     In its analysis in the Decision Document (and during debate on October 5, 2016), NMFS and the Council also relied on a number of other factors that Congress did not intend to

---

[23] *See* Public Comments available on the Council's website at: https://static1.squarespace.com/static/511cdc7fe4b00307a2628ac6/t/57fd259137c5817117c41153/1476208022214/RHS+Comments+Final.pdf; *see also* http://www.mafmc.org/s/EJ-Unique-Additional-Comments.pdf. *See also* letter submitted on behalf of the Herring Alliance attached as Exhibit 6.

[24] *See* Audio of October 4 RH/S Committee Meeting available at MAFMC website: http://mafmc.adobeconnect.com/p1328wyve8a/  at timestamp 1:14:00 – 1:19:00, 3:08:30-3:11:00.  For the Court's convenience Plaintiffs have provided a transcript of this audio attached hereto as Exhibit 8, at pp. 20-21, 50-51; *see also* Audio of October 5, Council Meeting available at MAFMC website: http://mafmc.adobeconnect.com/p8vg5cmy9bh/ at timestamp 1:25:30-1:28:00.  For the Court's convenience Plaintiffs have provided a transcript of this audio attached hereto as Exhibit 9, at pp. 22-23.

[25] *See* Exhibit 1 (White Paper) at 82; Exhibit 3 (Decision Document) at 94.

be considered when deciding whether river herring and shad need conservation and management

(as noted above, not whether "federal" management or "additional" management was necessary).

These factors included: (1) inadequate resources generally (cost-benefit analysis);[26] (2)

inadequate staff/ resources for EFH consultations;[27] (3) difficulty of completing adequate stock

assessments and determining proxies;[28] (4) fear that appropriate management would shut down

other federal fisheries;[29] (5) efforts to restore habitat in state waters;[30] (6) existing catch caps;[31]

(7) ineffective slippage measures;[32] (8) the theory that the currently low fishing effort and

incidental catch in the also severely depleted mackerel fishery is so small in comparison to

historical catch that it no longer matters;[33] and (9) voluntary bycatch avoidance programs exist.

  98. Ultimately, on October 5, 2016 the Mid-Atlantic Council voted six to thirteen to

"not act to add RH/S as stocks in the MSB FMP." ECF No. 67 at 3.

  99. Following the Mid-Atlantic Council's vote, NMFS immediately prepared a notice

for the Court taking the position that that "they have now complied with the remedy order and

respectfully request that the Court enter final judgment." ECF No. 67.

---

[26] *See* Exhibit 3 (Decision Document) at 15 (applicability of National Standard 7), 69 ("the agency may lack the resources to effectively implement the necessary actions related to river herrings and/or shads); *see also* October 4, 2016 RH/C Committee Audio at 1:39 – 1:40 NMFS: "You can't make us do something we can't afford;" Exhibit 8 at 26.

[27] *See* Exhibit 3 (Decision Document) at 80, 83; *see also* October 5, 2016 Audio at 38:00-39:00 (NMFS Staff); Exhibit 9 at p. 10.

[28] *See* Exhibit 3 (Decision Document) at 44-45, 78-80, 81.

[29] *See* Exhibit 3 (Decision Document) at 69 ("While the Council and Commission may come to an agreement, the Council would be bound to enact measures that keep catch at or below the ABC regardless. This could mean closing other federal directed fisheries quite earlier than would otherwise occur if state-waters catch approached (or was expected to approach) the ABC."); *see also* October 5, 2016 Audio at 1:14 (Exhibit 9 at 19), 51:00-52:00 (Exhibit 9 at 31).

[30] *See* Exhibit 3 (Decision Document) at 56, 57-59, 62-63.

[31] *See* Exhibit 3 (Decision Document) at 10, 45, 73, 89, 90.

[32] *See* Exhibit 3 (Decision Document) at 10, 76.

[33] *See* Exhibit 3 (Decision Document) at 73, 77, 81, 92, 93.

100.    A significant amount of new scientific information regarding the need to conserve and manage river herring and shad was brought to the Mid-Atlantic Council and NMFS's attention, yet the Council relied on factors Congress did not intend for it to consider (cost benefit analysis, funding issues, resource and staffing problems), failed to consider important aspects of the problem (its own trends analysis, new data on catch in other federal fisheries, the cumulative impacts of its decision on the ability of stocks to rebuild), and the Regional Administrator offered the sweeping generalization that – "you can take a little more time"[34] – that is both counter to the evidence and not a legal basis for decision-making under the Magnuson-Stevens Act.

## RELEVANT CASELAW

101.    A district court in this Circuit outlined in detail the relevant statute-based analysis a Council must undertake when determining whether a stock should be added to an FMP in the first instance: 1) determine which stocks can be treated as a unit for purposes of conservation and management and thus should be considered a fishery and managed together in a plan; and 2) determine which of these stocks require conservation and management based on the facts and the best available science. *See Flaherty v. Bryson*, 850 F. Supp. 2d 38, 53-56 (D.D.C. Mar. 8, 2012) (noting that "the MSRA requires ACLs and AMs for all stocks in need of conservation and management") (emphasis in original).  The *Flaherty* Opinion also explained that NMFS must review the Council decision for compliance with applicable law and standards, thus, "councils do not have unlimited and unreviewable discretion to determine the makeup of their fisheries," rather, decisions must be based on the statutory criteria and reviewed by NMFS to ensure it complies with the law. *Flaherty* 850 F. Supp. 2d at 56.

---

[34] *See* October 4, 2016 RH/S Committee Audio at 1:34:00-1:35:00 (Regional Administrator of NMFS); *see also* Exhibit 8 at p. 25.

102.     On September 21, 2016, the Ninth Circuit Court of Appeals extended and provided additional clarity to *Flaherty* and *Anglers Conservation Network v. Pritzker*, 70 F. Supp. 3d 427, 435 (D.D.C. 2014), *aff'd*, 809 F.3d 664 (D.C. Cir. 2016), holding that the Magnuson-Stevens Act "unambiguously requires a Council to create an FMP for each fishery under its authority that requires conservation and management," even "when a Council opts for state management." *See United Cook Inlet Drift Ass'n v. NMFS*, 2016 WL 5112031, *8 (9th Cir. Sep. 21, 2016).  The *Cook Inlet* Opinion also resolves debate about whether National Standard 7 and its guidelines, or any other National Standard guidelines, apply to the question of whether to manage a fishery.  They do not.  National Standards 3 and 7 "only govern the contents of an FMP, not the decision whether to issue one." *Cook Inlet*, 2016 WL at *7 (italics in original).

103.     Given the similar facts and related holdings, Plaintiffs brought *Cook Inlet* to the attention of the Council and NMFS several days prior to the October 4, 2016 River herring and Shad Committee meeting and the October 5, 2016 full Council meeting. *See* September 25, 2016 Letter from Earthjustice to MAFMC and NMFS General Counsel, attached hereto as Exhibit 5.

## CAUSES OF ACTION

## COUNT I: THE MID-ATLANTIC COUNCIL'S FAILURE TO INCLUDE RIVER HERRING AND SHAD IN THE MACKEREL SQUID AND BUTTERFISH FISHERY MANAGEMENT PLAN VIOLATES THE MAGNUSON-STEVENS ACT AND THE APA

104.     The Plaintiffs reallege and incorporate by reference paragraphs 1 through 103 of this Complaint in this First Cause of Action.

105.     River herring and shad are involved in the mackerel, squid and butterfish fishery, because they are caught in significant amounts and are either discarded at sea, or landed and sold.

106.     River herring and shad need of conservation and management.  The actions and measures described in ¶¶65-74 are prima facie evidence that river herring and shad require conservation and management, and the statements by NMFS staff and Mid-Atlantic Council members and staff acknowledge that river herring and shad need conservation and management.

107.     The Magnuson-Stevens Act's definition of conservation and management requires that the decision whether to add a stock to an FMP be based on the need for rebuilding, restoring, or maintaining that resource and the marine environment, assuring a food supply and recreational benefits to the nation, and avoiding long-term adverse effects on fishery resources and the marine environment. 16 U.S.C. § 1802(5).

108.     The Magnuson-Stevens Act requires that FMPs manage those stocks in need of conservation and management consistent with the national standards and any other applicable law. 16 U.S.C. § 1853(a)(1).

109.     The national standards apply to the development of conservation and management measures for stocks of fish once they are included in an FMP; they do not apply to the decision whether a fish stock needs conservation and management and therefore must be added to an FMP.  Compare 16 U.S.C. § 1852(h)(1) with 16 U.S.C. § 1853(a)(e.g., "(7) *Conservation and management measures* shall, where practicable, minimize costs and avoid unnecessary duplication." Emphasis added.).

110.     The national standard guidelines are by definition advisory and specifically do not have the force and effect of law, 16 U.S.C. § 1851(b), and also do not apply to the decision whether a fish stock needs conservation and management and therefore must be added to an FMP.

111.    In making its decision whether to add river herring and shad to the mackerel, squid, and butterfish FMP, the Mid-Atlantic Council relied on factors not included in the statutory definition of conservation and management, including a list of factors included in the proposed revisions to the National Standard 1 guidelines.

112.    The list of factors contained in the proposed revisions to the National Standard 1 guidelines relied upon by the Council is in all substantive respects the same as the list of factors contained in the final revised National Standard 1 guidelines.

113.    The Mid-Atlantic Council's reliance on factors not contained in the statutory definition of conservation and management, including the list of factors contained in the proposed revisions to the National Standard 1 guidelines, violated the Magnuson-Stevens Act and the APA.

114.    The Mid-Atlantic Council unlawfully transformed the decision about adding river herring and shad to the MSB FMP from the statutorily defined question of whether these fish need conservation and management, to questions about whether they need additional management by the council and whether there were quantifiable benefits that outweighed potential costs.

115.    The Mid-Atlantic Council's decision to not add river herring and shad as stocks in the mackerel, squid, and butterfish fishery, along with the failure to establish annual catch limits and accountability measures that prevent overfishing by 2011, violated the Magnuson-Stevens Act and the APA.

116.    The Mid-Atlantic Council has harmed the Plaintiffs' interests in healthy and sustainable river herring and shad populations, and their interest in maintaining a healthy ocean ecosystem.

117.     These actions and failures to act by the Mid-Atlantic Council are final agency

action that is arbitrary and capricious and violates the Magnuson-Stevens Act and the APA,

causing irreparable injury to the Plaintiffs for which they have no other adequate remedy at law.

## COUNT II: THE NATIONAL MARINE FISHERY SERVICE'S FAILURE TO INCLUDE RIVER HERRING AND SHAD IN THE MACKEREL SQUID AND BUTTERFISH FISHERY MANAGEMENT PLAN VIOLATES THE COURT'S ORDER, MAGNUSON-STEVENS ACT AND APA

118.     The Plaintiffs reallege and incorporate by reference paragraphs 1 through 117 of

this Complaint in this Second Cause of Action.

119.     The Court's Orders required NMFS to ensure compliance with the Magnuson-

Stevens Act and other applicable law when it and the Mid-Atlantic Council met the other terms

of the Orders (ECF No. 58 at ¶1).

120.     River herring and shad are involved in the mackerel, squid and butterfish fishery,

because they are caught in significant amounts and are either discarded at sea, or landed and

sold.

121.     River herring and shad are in need of conservation and management.  The actions

and measures described in ¶¶65-74 are prima facie evidence that river herring and shad require

conservation and management, and the statements by NMFS staff and Mid-Atlantic Council

members and staff also acknowledge that river herring and shad need conservation and

management.

122.     In making the decision whether to add river herring and shad to the mackerel,

squid, and butterfish FMP, NMFS and the Mid-Atlantic Council relied on factors not included in

the statutory definition of conservation and management, including a list of factors included in

the proposed revisions to the national standard guidelines.

123.     The Magnuson-Stevens Act's definition of conservation and management requires that the decision whether to add a stock to an FMP be based on the need for rebuilding, restoring, or maintaining that resource and the marine environment, assuring a food supply and recreational benefits to the nation, and avoiding long-term adverse effects on fishery resources and the marine environment. 16 U.S.C. § 1802(5).

124.     The Magnuson-Stevens Act requires that FMPs manage those stocks in need of conservation and management consistent with the national standards and any other applicable law. 16 U.S.C. § 1853(a)(1).

125.     The national standards apply to the development of conservation and management measures for stocks of fish once they are included in an FMP; they do not apply to the decision whether a fish stock needs conservation and management and therefore must be added to an FMP.  Compare 16 U.S.C. § 1852(h)(1) with 16 U.S.C. § 1853(a)(e.g., "(7) *Conservation and management measures* shall, where practicable, minimize costs and avoid unnecessary duplication." Emphasis added.).

126.     The national standard guidelines are by definition advisory and specifically do not have the force and effect of law, 16 U.S.C. § 1851(b), and also do not apply to the decision whether a fish stock needs conservation and management and therefore must be added to an FMP.

127.     NMFS and the Mid-Atlantic Council's reliance on factors not contained in the statutory definition of conservation and management, including the list of factors contained in the proposed revisions to the national standard guidelines, violated the Magnuson-Stevens Act and the APA.

128.    "Once a Council reaches a final decision, it is then NMFS which has the ultimate

statutory responsibility for ensuring that the requirements of the Magnuson-Stevens Act and any

other applicable laws are met. *See* ECF 58 at ¶1 citing *Flaherty v. Bryson*, 850 F. Supp. 2d at 54-

56.

129.    The Secretary is required to disapprove an FMP or FMP amendment to the extent

it is inconsistent with the Magnuson-Stevens Act or any other applicable law. 16 U.S.C. §§

1854(a)(1)(A), 1854(a)(3).

130.    The National Marine Fisheries Service's failure to ensure that it and the Mid-

Atlantic Council complied with the terms of the Court Orders, and its decision to not include

river herring and shad as stocks in the mackerel fishery and establish annual catch limits that

prevent overfishing of river herring and shad by 2011 violated the Court Orders, Magnuson-

Stevens Act and the APA.

131.    These actions and failures to act by NMFS is final agency action that is arbitrary

and capricious and violates the Magnuson-Stevens Act and the APA, causing irreparable injury

to the Plaintiffs, for which they have no other adequate remedy at law.

**COUNT III: NATIONAL MARINE FISHERIES SERVICE'S FAILURE TO
TAKE A HARD LOOK AT THE DEFINITION OF THE FISHERY
VIOLATES NEPA AND THE APA**

132.    The Plaintiffs reallege and incorporate by reference paragraphs 1 through 131 of

the Complaint in this Third Cause of Action.

133.    The Court's remedial orders required NMFS to ensure full consideration of: 1) a

reasonable range of alternatives including an alternative that immediately adds river herring and

shad as stocks to the MSB fishery and manages them by use of proxies (ECF No. 53 at ¶¶5, 6);

2) the environmental impacts of the prior decision not to add river herring and shad to

Amendment 14 (ECF No. 53 at ¶8); 3) the environmental impacts of not including river herring and shad in the fishery now (ECF No. 53 at ¶9); 4) the direct, indirect, and cumulative impacts of those decisions, (id.); and 5) compliance with the Magnuson-Stevens Act and other applicable law (ECF No. 58 at ¶1).

134.    Defendants were required by the Magnuson-Stevens Act to establish ACLs and accountability measures for all fisheries that required conservation and management by 2011. However, no ACLs and AMs have been established for river herring and shad despite their need for conservation and management.

135.    Amendment 14, including the decision not to add river herring and shad to the mackerel, squid, and butterfish FMP, is a major federal action that will significantly affect the quality of the human environment.

136.    NMFS failed to take a hard look at the environmental impacts of the definition (composition) of the mackerel, squid and butterfish fishery by failing to analyze a reasonable range of alternatives for adding river herring and shad in the remanded Amendment 14 EIS.

137.    NMFS failed to take a hard look at the environmental impacts of the definition (composition) of the mackerel, squid and butterfish fishery by failing to analyze the direct, indirect, and cumulative impacts related to adding river herring and shad in the remanded Amendment 14 EIS, including the impacts of not adding river herring and shad to the MSB FMP.

138.    NMFS failed to take a hard look at the environmental impacts of the definition (composition) of the mackerel, squid and butterfish fishery by failing to analyze the relationship between the short-term impacts to the environment of its decision not add river herring and shad to the MSB FMP and the maintenance and enhancement of affected environment's  long-term

productivity, and by failing to analyze the adverse environmental effects that could not be avoided in implementing its decision not to add river herring and shad to the MSB FMP.

139.    NMFS failed to prepare an adequate supplement to the Amendment 14 EIS reflecting the analysis required on remand and the significant new circumstances and information relevant to environmental concerns and bearing on the Mid-Atlantic Council's October 5, 2016 decision. *See* 40 C.F.R. § 1502.9(c).

140.    The APA requires that courts "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or that are "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D).

141.    NMFS violated NEPA, its implementing regulations, the Court's orders, and the APA by failing to take a hard look at the environmental impacts of its definition of the fishery by 1) failing to analyze a reasonable range of alternatives, and 2) the direct, indirect, and cumulative impacts, and of its decision in the remanded environmental impact statement for Amendment 14.

142.    NMFS violated NEPA, its implementing regulations, and the APA by failing to take a hard look at the relationship between the short-term uses of the environment and the maintenance and enhancement of its long-term productivity, and by failing to analyze the adverse environmental effects that could not be avoided, in implementing its decision not to add river herring and shad to the MSB FMP

143.    These actions by NMFS are final agency action that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, causing irreparable injury to the Plaintiffs, for which they have no adequate remedy at law.

**PRAYERS FOR RELIEF**

WHEREFORE, the Plaintiffs respectfully request this Court to enter the following relief:

1. Declare that the Mid-Atlantic Council violated the Magnuson-Stevens Act and the APA as described above in making the decision to not include river herring and shad as stocks in the MSB FMP;

2. Declare that the National Marine Fisheries Service violated the Magnuson-Stevens Act, the APA, and the Court's Orders as described above in making the decision to not include river herring and shad as stocks in the MSB FMP;

3. Declare that the Final Revised National Standard 1 Guideline provisions, 50 C.F.R. § 600.305(c), which includes a list of factors to be considered when deciding whether to add a stock of fish to a fishery management plan, violate the Magnuson-Stevens Act and the APA.

4. Declare that the National Marine fisheries Service violated NEPA, the APA, and this Court's Orders as described above by failing to take a hard look at the environmental impacts of the October 5, 2016 decision not to add river herring and shad to the MSB FMP.

5. Remand Amendment 14 and its EIS, compel NMFS to complete a supplemental EIS prepared fully consistent with this Court's Orders, NEPA, and other applicable law including analysis of:

    a. a reasonable range of alternatives, at least one of which would immediately add river herring and shad to the MSB FMP using proxy management measures, as necessary;

    b.   the environmental impacts of not adding river herring and shad to the MSB FMP, both when Defendants made their initial Amendment 14 decision and when the Court in ¶6 below ordered decision;

    c.   the direct, indirect, and cumulative impacts of not adding river herring and shad to the MSB FMP for both decisions identified in paragraph (b.); and,

    d.   the relationship between the short-term environmental impacts of the decision whether to add river herring and shad to the MSB FMP, and the maintenance and enhancement of the affected environment's long-term productivity; and,

    e.   the adverse environmental effects that cannot be avoided in implementing the decision whether to add river herring and shad to the MSB FMP.

6.  Compel the Mid-Atlantic Council and NMFS to reconsider their decision whether to add river herring and shad as stocks in the MSB FMP based on the SEIS and the correct Magnuson-Stevens Act standards;

7.  Require that all actions related to this remedial order, including implementation of any rules necessary to implement the decision of the Council, must be completed within a period of 16 months from the date of this order.

8.  Maintain jurisdiction over this action until the Defendants are in full compliance with the Magnuson-Stevens Act, NEPA, the APA, and every order of this Court;

9.  Award the Plaintiffs all their reasonable attorneys' fees and costs; and

10. Provide such additional and further relief as to which the Plaintiffs may justly be entitled.

DATED: November 4, 2016                    Respectfully submitted,

                                           */s/ Roger M. Fleming*
                                           ROGER M. FLEMING
                                           D.C. Bar No. ME0001
                                           ERICA A. FULLER
                                           D.C. Bar No. MA0001
                                           EARTHJUSTICE
                                           1625 Massachusetts Avenue, N.W.
                                           Suite 702
                                           Washington, D.C. 20036
                                           Telephone 202-667-4500
                                           Facsimile 202-667-2356
                                           rfleming@earthjustice.org
                                           efuller@earthjustice.org

                                           *Counsel for Plaintiffs*